Michele BANTZ, Plaintiff-Appellant,

v.

MONTGOMERY ESTATES, INC., Wells Fargo &
Co., Key Wisconsin, Inc., and Montgomery LG, Inc.,
Defendants-Respondents.

Court of Appeals

*No. 90–2265. Submitted on briefs April 29, 1991.—Decided
June 5, 1991.*

(Also reported in 473 N.W.2d 506.)

973

974

975

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Steven A. Koch* of *Seymour, Kremer, Nommensen & Morrissy* of Elkhorn.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Robert K. Sholl* and *John R. Stoffer* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.* of Milwaukee.

Before Brown, Scott and Anderson, JJ.

SCOTT, J. Michele Bantz appeals from a summary judgment granted in favor of Montgomery Estates, Inc., Wells Fargo and Co., Key Wisconsin, Inc., and Montgomery LG, Inc.—the various owners and general managers of the Americana Lake Geneva Resort (collectively, "the Americana"). She argues that summary judgment was improper because disputed issues of material fact remain regarding whether an employment contract existed. She also contends the trial court wrongly placed the burden of proof on her. We disagree and affirm.

Bantz was fired from her position as head cashier at the Americana, a resort complex, in March 1988 for allegedly failing to report a miscount in change. Bantz began working at the Americana as a cashier in early 1984. By the date of her termination, she had received several raises and the promotion to head cashier, a supervisory position. She never had been formally disciplined.

When Bantz was hired, she was given an employee handbook outlining general rules, regulations and disciplinary procedures. She signed a statement acknowledging receipt of the handbook and, at the same time, signed a security precautions agreement which outlined

her obligation to be observant for and to report incidents of suspicious activities on the premises. Bantz's affidavit states that she later received an updated version of the employee handbook, but was not required to acknowledge its receipt in writing.

In October 1985, Bantz signed an "Employment Conduct Policy," a document listing various acts which could be considered "just cause" for immediate dismissal. In addition, her promotion in July 1987 to head cashier required that she be familiar with the Americana's "Personnel Policies and Procedures Manual" so as to apply its contents to the employees she supervised. Among the procedures was a schedule of progressive discipline which Bantz asserts her supervisor and the personnel manager said must be followed before terminating an employee.

Upon her termination, Bantz filed suit against the Americana, alleging that the termination constituted a breach of contract. She asserted that the "contract" consisted of the Employee's Manual she received on date of hire; the Personnel Policies and Procedures Manual; the various documents she signed, such as the Employee Conduct Policy and the security precautions agreement; and statements her supervisor and the personnel manager made to her regarding the progressive discipline policy.

The Americana moved for summary judgment. After hearing arguments on the motion, the trial court found that no contract—express or implied—existed. It therefore granted summary judgment to the Americana. Bantz appeals.

■■■■

In reviewing motions for summary judgment, we apply the standards set forth in sec. 802.08, Stats., in the same manner as the trial court. *Moua v. Northern States*

*Power Co.,* 157 Wis. 2d 177, 184, 458 N.W.2d 836, 838 (Ct. App. 1990). Summary judgment is properly granted when there is no genuine issue of material fact and only a question of law is at issue. *Id.* Here, the historical facts are not in dispute. The only issue on appeal, therefore, is whether the various documents rise to the level of a contract. Whether facts fulfill a particular legal standard is a question of law to which we give *de novo* review. *DOR v. Exxon Corp.,* 90 Wis. 2d 700, 713, 281 N.W.2d 94, 101 (1979), *aff'd,* 447 U.S. 207 (1980).

■

Under Wisconsin law, the discharge of an at-will employee generally is not wrongful—*i.e.,* actionable—unless "the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest." *See Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 573, 335 N.W.2d 834, 840 (1983). Thus, absent such a public policy violation, unless the parties expressly abrogate the at-will status, such employees are "dischargeable at the whim of the employer." *See Ferraro v. Koelsch,* 124 Wis. 2d 154, 165, 368 N.W.2d 666, 672 (1985).

Bantz does not allege a public policy violation. Rather, she maintains that the Employee's Manual, the Personnel Policies and Procedures Manual and the statements regarding employee discipline made to her by her supervisor and the personnel manager converted the at-will employment relationship into a contractual one. She contends this contract placed limits on the Americana's right to terminate her employment. We are not persuaded.

■

Wisconsin policy favors employment terminable at will. *Id.* at 166, 368 N.W.2d at 672. In light of that policy, our courts have said they will not "by implication

*alone* convert a handbook produced by an employer for the guidance and orientation of employees into an express contract." *Id.* (emphasis in original). Rather, an employment manual may alter an at-will employment relationship only if the manual contains express provisions from which it reasonably could be inferred that the parties intended to bind each other to a different relationship. *See id.* at 168, 368 N.W.2d at 673.

In *Ferraro,* the court determined that the language of the employment handbook provided credible evidence of the parties' intent to create something other than an at-will relationship. *Id.* at 165, 368 N.W.2d at 672. The court concluded that, through the handbook, the employer made explicit promises to the employee. *Id.* at 167, 368 N.W.2d at 673. For example, the *Ferraro* handbook provided for different processes for discharging probationary and "regular" employees; set out a hierarchy of rules; and promised that the employee would be entitled to different treatment depending on the misconduct, with discharge resulting only for "just cause." *Id.* at 165, 368 N.W.2d at 672. The employee accepted the document and its promises by expressly promising to give two weeks' termination notice and by stating in writing that he accepted the terms "as a condition of my continued employment." *Id.* at 165–66, 368 N.W.2d at 672 (emphasis omitted).

Bantz attempts to draw parallels between her case and *Ferraro.* She contends that the various documents detailed what employee and employer would do for, and could expect from, each other. She notes, for example, that full-time employees received benefits such as insurance and holiday pay, items inuring to the benefit of the employee. Conversely, despite the fact that her job as cashier did not include security duties, and despite the presence of an on-premises security force, she was

required to sign the security precautions agreement.[1] This agreement, Bantz argues, inured solely to the benefit of the Americana.

Bantz also seizes upon the "just cause for dismissal" language in *Ferraro,* and points to the part of the Employee Conduct Policy which states: "Commission of the following acts *may be considered just cause* for dismissal." (Emphasis added.) She also contends that because the Americana, like the employer in *Ferraro,* used a different discharge process for probationary and nonprobationary employees, she and other nonprobationary employees must not have been at-will employees or the distinction would not have been necessary. *See id.* at 165, 368 N.W.2d at 672. Finally, she points to the "Disciplinary Action Policy," which prescribed a three-step disciplinary approach and provided that termination was to be considered "only after all other measures

---

[1] The security precautions agreement was prefaced by a short memo which read:

> TO: ALL EMPLOYEES
> FROM: CAROL OLSON, PERSONNEL DIRECTOR
> RE: SECURITY FAMILY
>
> Due to the size of our property and the volume of guests we serve, it is important that all employees become aware of our security needs.
>
> Please read and sign the form below to become a part of Americana's Security Family. This form is to be returned to Personnel, where it will become a part of your personnel file.

The security precautions agreement itself read:

> While carrying out my assigned duties at the Americana Lake Geneva Resort, I will be observant of any suspicious activities of guests, other employees, or any person on the hotel premises. I will immediately report any such activities to our Hotel Security Officers or the Hotel General Manager.

. . . have been exhausted." Bantz contends that since the trial court did not expressly address several of the documents in its decision, an issue of fact remains whether they were a part of her contract. We disagree.

We conclude the Americana intended to maintain an at-will employment relationship with Bantz: the employee handbook in effect at the time of Bantz's discharge expressly disclaims the existence of a contract; the Americana reserved the right to amend the handbook at any time without notice; and the progressive disciplinary procedures were stated in permissive, not mandatory, terms and expressly did not apply to firing for reasons of dishonesty.

That an employer conveys to an employee what is expected of him or her and that the employee complies does not alone produce a contract. "[P]erformance of services required by the job does not constitute consideration" for an employment contract. *Brumbaugh v. Ralston Purina Co.,* 656 F. Supp. 582, 586 (S.D. Iowa 1987). In fact, the employee handbook in effect when Bantz was terminated contained the following language:

> This Handbook is intended to give you information about the main features of our employment policies, benefits and certain other general information. *It does not, and is not intended to,* cover these matters in detail or *serve as a contract between you and Americana Hotels, Inc. All statements in this Handbook are subject to change without notice.* [Emphasis added.]

Although this language was not in the handbook issued to Bantz at the time she was hired and for which she acknowledged receipt in writing,[2] the question is what

---

[2]The statement Bantz signed when she received the first

terms were binding at the time of the incident. *See Ferraro,* 124 Wis. 2d at 163, 368 N.W.2d at 671. Since Bantz admitted in her affidavit that she received the second handbook, its terms control.

Moreover, the Americana consistently used permissive, rather than mandatory, language throughout its handbook when discussing employee discipline. For example, in the section entitled "Americana Hotels General House Rules," the handbook stated:

> If there is a violation and depending on what has occurred, we will issue warnings *in most cases . . ..* *Normally,* two warnings will be issued and if there is a third occurrence, dismissal *may* result. You *may* be put on suspension or probation if your manager feels it is warranted . . .. There are certain violations that are considered gross infractions of company policy.[3] These *may* be grounds for immediate dismissal and no warnings will be issued. [Emphasis added.]

handbook was merely an acknowledgement of receipt. It read in full: "This will verify that I have received a copy of the Americana Lake Geneva Resort Hotels Employee Rules and Regulations." By contrast, the statement the employee signed in *Ferraro v. Koelsch,* 124 Wis. 2d 154, 368 N.W.2d 666 (1985), read: "Furthermore, I understand the policies and rules and *accept them as a condition of my continued employment." Id.* at 166, 368 N.W.2d at 672 (emphasis in original).

[3] For example, the "Disciplinary Action Policy," which prescribed the three-step disciplinary approach and provided that termination was to be considered "only after all other measures . . . have been exhausted" also explicitly stated that it applied only "for reasons other than dishonesty or gross misconduct." Bantz was fired for alleged dishonesty.

In addition, the document entitled "Americana Hotels Employee Conduct Policy" listed a variety of infractions, the commission of any one of which could be considered just cause for immediate dismissal. That policy ended with the caution, however, that "[t]he Company does not indicate by the foregoing Rules and Regulations that an employee will not be subject to discipline or discharge for any other reason." In *Ferraro,* by contrast, the employer "bound itself to discharge only for 'just cause,' and then only after two warnings had been given—except in cases of severe rule violations, and in any case only after investigation." *Id.* at 170, 368 N.W.2d at 674. Here, the handbook suggests, but does not mandate, a certain progression of disciplinary steps, nor does it state that discharge would be only for "just cause."

Furthermore, the employee classifications to which Bantz refers simply delineate what, if any, company-paid benefits employees are entitled to depending on the number of hours they work. She provides no legal authority for her suggestion that providing benefits to an employee deprives an employer of the right to terminate an at-will employee, or that it fundamentally changes the nature of the employment relationship. Thus, while we agree that the handbook laid out rules, regulations and policies, we construe them to be more in the nature of "guidelines" than contractual demands, their permissive language underscoring the at-will nature of the employment relationship. *See Mursch v. Van Dorn Co.,* 851 F.2d 990, 995–96 (7th Cir. 1988) (applying Wisconsin law). We therefore conclude that Bantz was an at-will employee of the Americana.

Bantz next claims that the trial court improperly shouldered her with the burden of proving the existence of a contract when the Americana was the moving party. 

On motion for summary judgment, the burden is on the moving party to establish the absence of a genuine issue of material fact. *Kraemer Bros. v. United States Fire Ins. Co.,* 89 Wis. 2d 555, 565, 278 N.W.2d 857, 861 (1979). Once the movant establishes a *prima facie* case for summary judgment, the court then must examine the affidavits in opposition to the motion. *Id.* at 567, 278 N.W.2d at 862. To defeat the motion, the opposing party must set forth facts showing there is a genuine issue for trial. *Id.*

Here, the trial court stated:

> In a case such as this, when . . . the defense [the Americana] is asserting that summary judgment must be granted because of the fact that this was an employment at will situation, I think it's incumbent upon the plaintiff [Bantz] to come forward and show that there was a factual basis to support a contract . . . ..

We see nothing improper in this statement. In moving for summary judgment, the Americana asserted that there was no employment contract. After examining the supporting materials, the trial court determined that the Americana had made a *prima facie* case. At that juncture, it was Bantz's burden to come forward and show a factual basis existed to support a contract. When she failed to do so, the trial court properly granted summary judgment in favor of the Americana.

*By the Court.*—Judgment affirmed.